# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CRAIG WILLIAMS,                    )
                                  )
        Plaintiff,                )    1:23-cv-00037
                                  )
            v.                    )
                                  )
LAUREL R. HARRY, et al.,          )
                                  )
        Defendants.               )

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Plaintiff Craig Williams, an inmate at the Pennsylvania Department of Corrections ("DOC") SCI-Albion, brings this action to vindicate rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA) and, via 42 U.S.C. § 1983, the First Amendment's Free Exercise Clause. (ECF No. 74). Williams sues Laurel Harry, the DOC Secretary, and Reverend Ulrich Klemm, the DOC's Administrator for Religion and Volunteer Services. Each is sued in both their individual and official capacities. (*Id.* ¶¶ 5–6).

This case centers on the DOC's [1] evolving religious meals policies. Williams alleges that the DOC's two most recent meal policies deprive him of his right to properly celebrate Eid al-Fitr and Eid al-Adha, two Islamic holidays that he now asserts traditionally require a feast that includes fresh halal meat.

Prior to January 1, 2023, Williams engaged in the feasts associated with the Eid holidays according to what he alleges conformed to the tenants and practices of Islam, but as to those

---

[1] Unless otherwise specified, the Court refers to the Defendants as "Defendants" and "DOC" interchangeably in this Opinion.

holidays falling after that date, the DOC changed its religious meals policy. There are two amended DOC religious meal policies presently at issue: the "Fellowship Meal Policy," colloquially known as the Little Policy, announced via the Little Memo, and the newer "Shelf Stable Policy." The application of the Little Policy at SCI-Albion was preliminarily enjoined by the Court for the 2023 Eid holidays, (ECF Nos. 46, 47), and the DOC has since consented to the extension of that Order, as to SCI-Albion, for the 2024 Eid holidays. (ECF No. 136). The Shelf Stable Policy, should the Court not grant Williams's Motion for Summary Judgment or expand its preliminary injunction to include the Shelf Stable Policy, would go into effect at SCI-Albion beginning with the 2025 Eid holidays.

The parties each filed wall-to-wall Motions for Summary Judgment. (ECF Nos. 92, 96). Those Motions are fully briefed. For the reasons set out below, the Court concludes as follows:

- Williams's Motion for Summary Judgment (ECF No. 96) is granted in part and denied in part. There is no genuine dispute of material fact as to whether the Little Policy substantially burdened Williams's sincerely held religious beliefs for purposes of RLUIPA by not being the least restrictive means to achieve the DOC's stated penological goals and needs, and accordingly, that Policy is permanently enjoined as to SCI-Albion. The balance of Williams's Motion will be denied.

- Defendants' Motion for Summary Judgment (ECF No. 92) is granted in part and denied in part. RLUIPA does not permit claims for money damages against any Defendant, and with respect to Williams's First Amendment claims, sovereign immunity bars claims for money damages against Harry

and Klemm in their official capacities with respect to both the Little Policy and the Shelf Stable Policy.

- Williams cannot obtain monetary relief as to any claim directed at Harry and Klemm in their individual capacities, as such relief is barred by qualified immunity. There is not a sufficient wall of precedent confirming that Defendants' actions as alleged violated a clearly established constitutional right. Monetary damages are therefore completely unavailable to Williams as to Harry and Klemm.

- Summary judgment is granted to all Defendants as to Williams's First Amendment challenge as applied to the Little Policy.

- As to the Shelf Stable Policy, summary judgment is granted to all Defendants with respect to Williams's First Amendment Claim. Williams raises two challenges to the Shelf Stable Policy: the lack of fresh halal meat as part of Eid meals and the lack of charitable giving opportunities for him to pay for his fellow inmates' meals to "properly" celebrate the Eid holidays. However, neither challenge raises a genuine dispute of material fact as to Williams's claims under the First Amendment's Free Exercise balancing test.

- As to Williams's RLUIPA claim, summary judgment is granted for Defendants as to the charitable giving aspect of Williams's challenge to the Shelf Stable Policy. Even assuming that such particular religious belief is sincerely held by Williams, as a matter of law, the DOC's restriction on charitable giving as implicated here advances compelling government

interests—penological safety and security—and is the least restrictive means to achieve those interests, as a matter of law.

- Summary judgment is denied as to all parties as to Williams's RLUIPA claim as applied to his "fresh" halal meat allegations. A genuine issue of material fact exists as to whether that belief is sincerely held by Williams and, if it is, whether the Shelf Stable Policy advances a compelling penological interest and is the least restrictive means to fulfill that interest. Because all other claims have been resolved in favor of one of the parties and only equitable relief would be available as to this single specific claim, this is the lone claim that will be slated for resolution at a bench trial.

## I.    BACKGROUND

Plaintiff Craig Williams is a Salafi Muslim. (ECF No. 98 ¶ 12). Salafi Muslims seek to closely emulate the early Muslim generations, known to Salafi Muslims as their "pious predecessors." Williams has practiced Islam since 2013. (*Id.*). Williams's religious beliefs require him to participate in the observations of Eid al-Fitr and Eid al-Adha, two Islamic holidays that commemorate the breaking of the Ramadan fast and the tenth day of the Dhul-Hijjah, respectively.

Prior to 2023, Williams was able to engage in these ceremonial meals in DOC custody without issue, purchasing his own, halal-complaint meals from an outside vendor (*id.* ¶ 41), but after then-Secretary George Little issued a new policy directive (*id.* ¶ 85), that changed. The "Little Memo" brought about the "Fellowship Meals Policy," during which qualifying faith groups could select only up to two "fellowship" meals per year. (*Id.* ¶ 86). This program was to replace the previously existing program which, according to Williams, was in compliance with his sincerely

held religious beliefs. Defendant Klemm was instrumental in the drafting of the Little Memo. (*Id.*
¶ 88–90).

According to the DOC, the Little Policy was implemented in response to the growing
number of faith groups in the DOC and their respective needs for faith-based meals. Importantly,
and at issue here, this Policy did not provide faith groups with the ability to purchase optional
menu items from outside vendors at their own expense, as had been past practice. (*Id.* ¶ 91). The
Policy instead offered faith groups the option to select a meal from the DOC's weekly food menu
(the "mainline"), but such menu did not offer halal meat or other similar foods. (*Id.* ¶ 93). This
Policy, however, did not apply to the consumption of food related to "religious rites," a distinction
that the DOC has relied upon in ensuring that Jewish inmates could have Kosher food for Passover.
(*Id.* ¶¶ 106–128). That is, according to the DOC and Defendant Klemm, "NO religious traditions
require or mandate the consumption of certain foods on any holy day," and the feasts associated
with the Eid holidays are "just" traditions, not religious rites. (*Id.* ¶ 94–97) (capitalization in
original).

In response to the Little Policy, Williams brought suit *pro se* and filed a Motion for a
Preliminary Injunction (ECF Nos. 3, 6), arguing that the Little Policy violated his First and
Fourteenth Amendment rights and RLUIPA. (ECF No. 6 at 6). After Williams obtained counsel,
counsel supplemented Williams's *pro se* Motion and Complaint, arguing that the change resulting
from the Little Policy—namely, Williams's inability to purchase his own, halal-compliant food
for the Eid holidays—violated Williams's rights under RLUIPA. (ECF Nos. 18, 42). Neither
counseled supplement discussed Williams's claims under the First and Fourteenth Amendments.

After Eid al-Fitr 2023 but before Eid al-Adha 2023, the Court issued a preliminary injunction. (ECF Nos. 46, 47).[2] The Court concluded that Williams had a reasonable probability of a likelihood of success on the merits of his RLUIPA claim and that the other equities weighed in favor of enjoining the Little Policy as to SCI-Albion. That preliminary injunction ordered Defendants to maintain the pre-Little Memo *status quo* at SCI-Albion pending further Order of Court. (ECF No. 47).

After the preliminary injunction was issued, there were multiple procedural and factual developments in the case. First, Williams filed an Amended Complaint, dropping his Fourteenth Amendment claim. (ECF No. 74). Only claims under RLUIPA and the First Amendment (via § 1983) remain. As to those claims, Williams seeks monetary damages, a declaratory judgment, and a permanent injunction. (*Id.* at 10–11).

Second, the DOC issued a new religious meal policy for 2024, the Shelf Stable Policy (ECF No. 83). The Shelf Stable Policy, like the Little Policy, still limits qualifying faith groups to two designated religious meals per calendar year. (*Id.* ¶ 5). Further, a given faith group can decide the meal of their choice from the master menu and then also place a group order for "one identical inmate-purchased shelf stable food item to supplement each Religious Meal (which could be a single item or a shelf-stable meal up to 12 oz.)[.]" (*Id.*).

The Shelf Stable Policy has other provisions that are at issue here. That Policy provides that only inmates with "sufficient funds" may participate in the group order of the shelf stable supplement. (ECF No. 83-1 ¶¶ 16, 24, 25). Inmates who did not themselves pay, including those

---

[2] The Court denied Williams's original request for a temporary restraining order because the DOC informed the Court that it provided Mr. Williams with a traditional, halal-confirming meal for Eid al-Fitr 2023. (ECF No. 28).

who cannot afford to do so, cannot participate in the consumption of any shelf stable religious meal supplement, and other inmates may not pay additional funds to accommodate those with insufficient funds. (*Id.* ¶¶ 24–25).

Williams says that this new policy is also in violation of RLUIPA and his First Amendment right to the free exercise of his religion. The Shelf Stable Policy, according to Williams, violates his rights in two ways: (1) a halal meal, per Williams, must include "fresh" meat (slaughter and consumption must occur within a three day period), and no shelf stable food complies with his interpretation of that aspect of his religion; and (2) Islamic teachings counsel that one should conduct charitable giving at the Eids, and because Williams (a) cannot pay for shelf stable halal food for other DOC inmates that cannot afford to pay for it and (b) cannot share his shelf stable halal food with those that cannot afford to pay for it, he cannot properly adhere to that religious principle. (ECF No. 98 ¶¶ 29–31, 35).

The DOC says, in essence but not expressly, that Williams's belief about "fresh" halal meat is either insincere, non-religious, or both, as this belief did not arise in this litigation (or before) until the DOC announced the Shelf Stable Policy during the pendency of this case. (ECF No. 100 at 3; ECF No. 105 at 3–4). Further, the DOC notes that even under the prior, pre-Little Memo religious meal policy that Williams seeks to reinstate at SCI-Albion, halal meat was not slaughtered, prepared, and served within a three-day window (as Williams's interpretation of his asserted religious belief require), and Williams purportedly had no issues with that prior policy. (ECF No. 105 at 4). That is, prior to the institution of the Little Policy and the Shelf Stable Policy, Williams consumed halal meat at Eid feasts, even though it was not "fresh" as Williams now defines it. (*Id.*). As for the charitable giving allegations, the DOC does not address this point head-

on, and instead relies upon the general penological interests it advances in defense of its current Shelf Stable Policy.

Each party filed Motions for Summary Judgment. (ECF Nos. 92, 96). The impact of both the Little Policy and the Shelf Stable Policy on Williams are at issue.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Motions for summary judgment, and responses in opposition to such motions, must be supposed by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts but will be denied when there is a genuine issue of material fact." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A material fact is a fact whose resolution will affect the outcome of the case under applicable law. *Liberty Lobby.*, 477 U.S. at 248. The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1061 (3d Cir. 1991). The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989) (stating that the non-movant must present affirmative evidence—more than a scintilla but less than a preponderance—which supports each element of his claim to defeat a properly presented motion for summary judgment). "[S]ummary judgment is to be entered if the evidence is such that a reasonable fact finder could find only for the moving party." *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the Court concludes that the record presented is inadequate or inconclusive, denial of a summary judgment motion is appropriate. *Taylor v. Truman Med. Ctr.*, No. 03-cv-0001, 2006 WL 2796389, at *3 (W.D. Mo. Sept. 25, 2006).

## III.    CLAIMS FOR MONEY DAMAGES

Turning first to Williams's claims for money damages, such cannot be obtained against any Defendant in this case because of RLUIPA's statutory structure, sovereign immunity, and qualified immunity.

### a.    RLUIPA and Sovereign Immunity

Focusing first on Williams's claims for money damages against Defendants in their official capacities, "RLUIPA does not allow for the recovery of money damages. . . . in other words, a RLUIPA plaintiff may seek only injunctive or declaratory relief." *Parkell v. Senato*, 704 F. App'x 122, 125 (3d Cir. 2017) (citation omitted). Thus, the only question for the Court with respect to Williams's claims for money damages is whether immunity doctrines bar Williams's damages claim under the First Amendment, advanced via § 1983.

Williams's First Amendment claim against Harry and Klemm in their official capacities is effectively a claim against the Commonwealth of Pennsylvania. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The Eleventh Amendment bars suit for money damages against states where those states do not consent to suit.[3] U.S. Const. amend. XI; *Hans v. Louisiana*, 134 U.S. 1, 13 (1890). While Congress has the power to abrogate sovereign immunity when violations of the Fourteenth Amendment are at issue, its intent to do so must be "unmistakably clear." *Seminole Tribe Fla. v. Florida*, 517 U.S. 44, 56 (1996) (citations omitted). Under this test, the Supreme Court held that Congress did not abrogate sovereign immunity with respect to money damages claims brought under 42 U.S.C. § 1983. *Quern v. Jordan*, 440 U.S. 332, 345 (1979). And although Pennsylvania itself may waive sovereign immunity by consent, it has not done so in this arena. *Chittister v. Dep't Cmty. & Econ. Dev.*, 226 F.3d 223, 226–27 (3d Cir. 2000) ("[The Commonwealth] has waived immunity only for certain specified tort claims in suits for damages in state court.") (citing 42 Pa. Cons. Stat. § 8522).

Here, there is no contention that Harry and Klemm were not acting within the scope of their employment with the Commonwealth in establishing and enforcing the Policies that are at issue in this case. Nor is there any suggestion that the Commonwealth consented to suit here via one of the exceptions listed in 42 Pa. Cons. Stat. § 8522(b). Consequently, suits for money damages against Harry and Klemm in their official capacities are barred by sovereign immunity. Summary judgment is granted for Defendants on those claims.

---

[3] Though Defendants did not raise sovereign immunity in their filings, sovereign immunity goes to the subject matter jurisdiction of the Court, and accordingly, the Court can raise sovereign immunity *sua sponte*: "State sovereign immunity is a jurisdictional bar which deprives federal courts of subject matter jurisdiction." *Wright v. New Jersey/Dep't of Educ.*, 115 F. Supp. 3d 490, 494 (D.N.J. 2015) (citing *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 73 (2000)).

### b. Qualified Immunity

With the official capacity damages claims resolved, Williams's only remaining effort to recover damages from Defendants is his § 1983 Free Exercise claim brought against Defendants in their individual capacities. Defendants argue that these claims for money damages against them as individuals should also be resolved in their favor because, according to them, qualified immunity bars recovery.

"The party asserting the defense of qualified immunity bears the burden of establishing it," *Rogers v. United States*, No. CA 08-149, 2011 WL 3290208, at *4 (W.D. Pa. June 17, 2011), *report and recommendation adopted*, No. CIV.A. 08-149, 2011 WL 3298422 (W.D. Pa. July 29, 2011), and "[w]hen summary judgment is sought on a qualified immunity defense, the court inquires whether the party opposing the motion has raised any triable issue barring summary adjudication." *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011).

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). "To be clearly established, a right must be sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." *Id.* (citations and internal marks omitted) (emphasis added).

The inquiry when conducting the "clearly established" analysis is a narrow and particular one. The Court is to look to "factually analogous Supreme Court precedent, as well as binding opinions from [the Third Circuit]." *Jefferson v. Lias*, 21 F.4th 74, 81 (3d Cir. 2021). Absent such controlling precedent, the Court is to determine whether a "robust consensus of persuasive authority" from the other Courts of Appeals and district courts demonstrate that a given right was

clearly established at the time that it was allegedly violated. *Id.* (citation omitted).[4] When examining prior cases for factual analogues, precisely matching precedent is not required, but the Court cannot view the right at issue at a broad level: "This inquiry . . . 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) (citation omitted). This is because, for defendant public officials to actually be on notice that they are violating an individual's rights, "the contours of the right[s] must be sufficiently clear." *United States v. Lanier,* 520 U.S. 259, 270 (1997) (citation and internal marks omitted).

Here, there are three ways in which Defendants' Policies allegedly violated Williams's rights under the First Amendment: (1) the Little Policy prevented Williams from eating halal meat at or around the Eid holidays; (2) the Shelf Stable Policy prevents Williams from eating *fresh* halal meat at or around the Eid holidays; and (3) the Shelf Stable Policy precludes Williams from charitable giving to other inmates to ensure that they can eat fresh halal meat at or around the Eid holidays. The question is not, as Williams proposes, whether Defendants' Policies violate his right to the free exercise of his religion at a broad level—the characterization of the rights at issue "must be undertaken in light of the specific context of the case." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).

Working backwards, there is no clearly established right to charitable giving to ensure that other inmates can eat halal meat at or around the Eid holidays. Williams does not cite a single case,

---

[4] Though courts are to generally look to opinions from the federal Courts of Appeals in addition to those of the Supreme Court in determining whether a given constitutional right was clearly established at the time of the alleged conduct at issue, recent decisions from the Supreme Court suggest that only *its* precedent can clearly establish a given constitutional right: "Neither Cortesluna nor the Court of Appeals identified any Supreme Court case that addresses facts like the ones at issue here. Instead, the Court of Appeals relied solely on its precedent in *LaLonde. Even assuming that Circuit precedent can clearly establish law for purposes of § 1983*, *LaLonde* is materially distinguishable and thus does not govern the facts of this case." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (per curiam) (emphasis added).

from any court, indicating that a ban on such charitable giving, in the penological context and where the desire to charitably give is connected to a sincerely held religious belief, is a clear violation of the First Amendment right to the free exercise of religion. There is no such binding Supreme Court or Third Circuit authority nor a "robust consensus" of authority from other federal courts on this issue.

Similarly, there is no clearly established right to *fresh* halal meat in a state prison at or around the Eid holidays. Again, Williams does not cite a single case discussing the denial of fresh halal meat in the First Amendment context, and given the focused nature of that particular asserted belief, reliance on cases where the provision of halal meat (regardless of its freshness) was at issue does not meet qualified immunity's demanding relatedness test, especially since none of Williams's cited cases come from the Supreme Court. *See Cortesluna*, 595 U.S. at 6.

Whether there is a clearly established right to be able to purchase halal meat for consumption at or around the Eid holidays could fairly be described as a closer question than the prior two, but Defendants still have the better of the argument, entitling them to summary judgment on this issue.

The relevant cases from the Third Circuit regarding the provision of halal meat to Muslim prisoners, discussed in greater detail in the Court's Preliminary Injunction Opinion, are *Williams v. Morton* and *Riley v. DeCarlo*. In *Morton*, the court affirmed the district court's grant of summary judgment to prison officials where the plaintiff-appellants argued that the New Jersey State Prison's failure to provide them with halal-conforming meals violated their free exercise rights. 343 F.3d 212, 215, 221 (3d Cir. 2003). In *Riley*, the court rejected the plaintiff-appellant's argument under RLUIPA that the DOC's failure to provide him with a halal-conforming meal was

13

a violation of his sincerely held religious beliefs despite the reality that the DOC provided Jewish prisoners with Kosher meals. 532 F. App'x 23, 28–29 (3d Cir. 2013).

There are no controlling cases from our Circuit that clearly establish the right Williams puts at issue. Both *Morton* and *Riley* concerned the provision of halal meat on a daily basis— neither focused on the provision of halal meat for the Eid holidays only, which would be twice a year, and other courts that have taken up that more precise question have reached mixed results. Some courts have concluded that a defendant penal institution's preparation for Eid that did not include optional menu items *could* constitute a substantial burden under RLUIPA., *Banks v. Sec'y Pa. Dep't of Corr.*, 601 F. App'x 101, 105–06 (3d Cir. 2015). Others have concluded that the failure to provide Muslim prisoners with an Eid feast could present a First Amendment issue. *Pleasant-Bey v. Shelby Cnty.*, No. 18-6063, 2019 WL 11769343, at *5 (6th Cir. Nov. 7, 2019). Importantly, however, the *Banks* and *Pleasant-Bey* cases do not affirmatively hold that a prisoner has a clearly established right to an Eid feast according to that prisoner's religious scruples; those cases say that the failure to provide an Eid feast meal, in a general sense, presented an issue of fact as to whether that decision constituted a violation of RLUIPA or the First Amendment. That is, according to those decisions, the right that Williams claims is clearly established was only possibly extant.

Two out-of-Circuit cases do provide more support for Williams's arguments on this point. In *Ackerman v. Washington*, the court, addressing a RLUIPA claim concerning the provision of Kosher food for ceremonial purposes, affirmed the district court's judgment in the plaintiff prisoner's favor. 16 F.4th 170, 191 (6th Cir. 2021). The Second Circuit has gone even further, expressly holding that prison officials were not entitled to qualified immunity where they postponed an Eid al-Fitr meal by one week. *Ford v. McGinnis*, 352 F.3d 582, 585, 597–98 (2d Cir. 2003) (Sotomayor, J.).

14

Yet contrary decisions from other Circuits, and our own, call the rationales in *Ford* and *Ackerman* into question. In *Norwood v. Strada*, the court affirmed the district court's grant of summary judgment for the defendant where the plaintiff prisoner brought an RFRA claim after he was denied halal food during a lockdown, concluding that such was a *de minimis* intrusion. 249 F. App'x 269, 272 (3d Cir. 2007). Similarly, in a case where a suspected terrorist was taken into custody by the FBI shortly after the 9/11 attacks and was served pork; was refused information as to the time of day which resulted in him not being able to pray at appropriate times; was refused meals after sundown during Ramadan; and was abused by penal officers while praying, the Court rejected the reasoning in *Ford*, concluding that the interference with religious exercise as to the meal-related claims as to the actions experienced by the plaintiff was *de minimis*. *Omar v. Casterline*, 414 F. Supp. 2d 582, 590–93 (W.D. La. 2006).

Thus, though some out-of-Circuit cases support the broad principles of Williams's argument, other cases in the RLUIPA, RFRA, and First Amendment spheres call into question whether a prisoner or detainee's right to have the halal diet of their choice for a religious holiday is a clearly established constitutional right. Indeed, one decision from this Court expressly concluded that qualified immunity bars claims for money damages against defendants sued in their individual capacities where those defendants failed to provide the plaintiff prisoner with a halal meat Eid feast meal. *Rogers*, 2011 WL 3290208, at *6 ("So then, in January 2006, FCI–McKean officials could have reasonably believed that Plaintiffs had no constitutional right to Halal meat for their Eid celebration.").

The absence of a consensus as to this principle further demonstrates that the right that Williams is alleging was violated under the Little Policy was not clearly established. There is no body of precedent from the federal courts—let alone Supreme Court precedent—that demonstrates

that "every reasonable" correctional official in Harry and Klemm's shoes would have or should have known that they were violating Williams's clearly established rights by drafting and implementing the Little Policy. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam). Absent binding precedent or a robust consensus of persuasive authority, Defendants are entitled to the "breathing room" that qualified immunity provides for government officials to "make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). And this is not the rare case where Defendants' conduct is so facially demeaning and egregious that, even without that robust consensus of persuasive authority, Defendants should have known that their conduct, by virtue of its inherently abusive nature, would have violated clearly established constitutional rights. *See Hope v. Pelzer*, 536 U.S. 730 (2002) (inmate chained to hitching post without shirt in the Alabama summer sun and denied water and bathroom breaks while officials put water in front of him before kicking it over); *Taylor v. Riojas*, 592 U.S. 7 (2020) (per curiam) (inmate locked in cells covered "nearly floor to ceiling" with feces and sewage and made to sleep in sewage).

Qualified immunity applies here, and Williams cannot obtain money damages from Defendants in their official or personal capacities.

## IV.    CLAIMS FOR EQUITABLE RELIEF

With Williams's claims for money damages resolved, the only question that remains at issue is whether Williams may be entitled to equitable relief under RLUIPA and/or the First Amendment. *See Wright*, 115 F. Supp. 3d at 494 (stating that there is an exception to state sovereign immunity where "prospective injunctive relief is sought against state officials to end continuing or ongoing violations of federal law") (citing *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 503 (3d Cir. 2001)). The Court will analyze the parties' Motions separately, as the

inferences that the Court is required to draw at this procedural stage impact the resolution of each Motion differently. However, prior to reaching the merits of these issues, the Court must determine whether the claims as to the Little Policy are moot.

### a. Whether the Claims as to the Little Policy are Moot

The Constitution provides the federal courts with the authority to decide "Cases" and "Controversies." U.S. Const. art. III §2. Over time, courts have construed the Constitution's reference to cases and controversies as imposing limits on the jurisdiction of the federal courts beyond the limits textually set forth in Article III. One such jurisdictional limit is mootness: at each stage of litigation, a litigant must have suffered an injury traceable to the defendant's conduct that is redressable by a favorable decision. *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). Mootness commonly arises when "events in the world overtake those in the courtroom, and a complaining party manages to secure outside of litigation all the relief he might have won in it. When that happens, a federal court must dismiss the case as moot." *FBI v. Fikre*, 601 U.S. 234, 240 (2024). The federal courts cannot pass judgment on "past actions that do not have any 'continuing effect' in the world." *Id.* (citing *Spencer v. Kemna*, 523 U.S. 1, 18 (1998)).

It is the third prong of the case or controversy requirement that is missing with respect to Williams's claims for equitable relief as applied to the Little Policy. Because—in the wake of the adoption of the Shelf Stable Policy—the Little Policy is not in effect anywhere in Pennsylvania, and because there is no indication that the DOC has any plans to reinstate the Little Policy, a favorable decision in Williams's favor—in the form of a permanent injunction—will not redress his purported injury. More simply, because the Little Policy is no longer in effect, Williams's injury (at least, this precise injury) is not ongoing, and by extension, equitable relief would not cure it.

Several exceptions to mootness permit some cases to remain in federal court even where the cases and controversies requirement's three prong test is not facially met. "[A] defendant's voluntary cessation of a challenged practice will moot a case only if the defendant can show that the practice cannot reasonably be expected to recur." *Id.* at 241 (citations and internal marks omitted). This is a "formidable burden" for a defendant to meet, as "a federal court's constitutional authority cannot be so readily manipulated. To show that a case is truly moot, a defendant must prove no reasonable expectation remains that it will return to [its] old ways." *Id.* (citations and internal marks omitted).

In *Fikre*, the plaintiff-respondent was placed on the federal government's "No Fly List," allegedly because of his religious beliefs and in violation of the Constitution. *Id.* at 239. Fikre filed suit, and while that case worked its way through the judicial system, Fikre was removed from the No Fly List. *Id.* After the mootness question bounced back and forth between the district court and the court of appeals, the dispute ended up at the Supreme Court, and the Court held that the controversy then before it was not moot. *Id.* at 242. The Court viewed a Government officer's declaration that it would not relist Fikre based on "currently available information" as insufficient assurance that the allegedly violative conduct could not be reasonably expected to recur. *Id.* The Court also rejected the notion that Fikre's absence from the No Fly List for eight years was a sufficient basis for a mootness dismissal. *Id.* at 243.

*Fikre* is controlling here. As in that case, the DOC's allegedly illegal conduct only ceased after this suit was filed and litigated. Indeed, the DOC did not adopt the Shelf Stable Policy until after the Court entered its preliminary injunction order enjoining the Little Policy at SCI-Albion. Unlike in *Fikre*, however, the DOC does not contend that issues related to the Little Policy are moot; in fact, during oral argument, counsel for Defendants disclaimed the Court's suggestion that

the issues raised by the Little Policy were moot.[5] So unlike in *Fikre*, the Court does not even have Defendants' word that the violative conduct is unlikely to recur. While it is true that the Little Policy has been replaced and is not currently in effect, the same could be said of Fikre's removal from the No Fly List. The Supreme Court gave little weight to the eight-year period in which Fikre remained off the No Fly List. Similarly, here, the Court cannot give weight to the existence of the Shelf Stable Policy for a period of about one year after the former Policy was enjoined. This is especially so where, as here, defense counsel has asserted that claims as to the Little Policy are not moot and where the cessation of the challenged conduct arose because of this Court's Order and not because of any volitional choice by Defendants. Therefore, Defendants have not surmounted the "formidable burden" of demonstrating that the challenged conduct is unlikely to recur, and consequently, the issues raised by the Little Policy are not at this point moot.

### b.  Plaintiff's Motion for Summary Judgment on his Claims for Injunctive Relief

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise" of a prisoner "unless the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). "Religious exercise" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the Free Exercise thereof." U.S. Const. amend. I. The First Amendment is applicable to the states. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Though

---

[5] Defense counsel has, in other cases before this Court implicating the Little Policy, similarly asserted that the legal issues stemming from the Little Policy are not moot. *See Molina v. Little*, 1:23-cv-257.

"[i]nmates clearly retain protections afforded by the First Amendment, . . . including its directive that no law shall prohibit the free exercise of religion," *O'Lone v. Shabazz,* 482 U.S. 342, 348 (1987), these rights may give way to "the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security." *DeHart v. Horn*, 227 F.3d 47, 50–51 (3d Cir. 2000). Our Court of Appeals explained how courts should analyze Free Exercise challenges brought by prison inmates:

> [*Turner*] directs courts to assess the overall reasonableness of such regulations by weighing four factors. First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and this connection must not be so remote as to render the policy arbitrary or irrational. Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests.

*Waterman v. Farmer*, 183 F.3d 208, 213 (3d Cir. 1999) (citation and internal marks omitted).

### 1. The Little Policy

Although this Court cannot conclude that Defendants' conduct associated with the Little Policy violated a clearly established right that would render qualified immunity inapplicable, the Court's inquiries under RLUIPA and the First Amendment as to claims for equitable relief are of a different tenor—the lack of a robust wall of precedent supporting William's positions is not *per se* fatal to Williams's statutory and constitutional claims for such non-monetary relief.

Under RLUIPA, the Court looks to whether there is a substantial burden on Williams's sincerely held religious beliefs. If so, the burden shifts to the DOC to demonstrate that its challenged policy is the least restrictive means to advance a compelling government interest. *Holt v. Hobbs*, 574 U.S. 352, 362 (2015). Williams believes that the tenants of Islam require that halal

meat, not just halal-compliant food, be consumed during Eid feasts. The sincerity of this particular religious belief is not disputed; instead, Defendants argue that (1) the Little Policy does not substantially burden this particular belief and (2) the Little Policy satisfies strict scrutiny. Since the Court ruled on Williams's favor on this issue at the preliminary injunction stage (ECF No. 47 at 14–20), little has changed—Williams still has the better of both arguments.

First, the Little Policy does substantially burden Williams's sincerely held religious belief. Williams says that he must (or at least have the option to) eat halal meat for the Eid holidays. Under the Little Policy, Williams would be unable to do so. This unquestionably constitutes a burden on Williams's religious exercise, and given the importance of the Eid holidays in Islam, it is a substantial one. While Defendants are correct that not every penological food restriction constitutes a substantial burden under RLUIPA (ECF No. 93 at 26 (collecting cases)), the food restriction at issue here, as applied to this particular Plaintiff, does constitute such a substantial burden.

Second, as to the strict scrutiny portion of RLUIPA, Defendants argue, as they did at the preliminary injunction stage, that if judgment is awarded in Williams's favor, they will have to do the same thing for many other faith groups, and that is a sprawling task presenting administrative and financial difficulties that are not readily overcome. But once again, those arguments fall short of the "more focused inquiry" that RLUIPA demands. *Holt*, 574 U.S. at 363.

Defendants state that the financial cost as to staff hours of providing every faith group a holiday feast is prohibitive ($1.4 million, ECF No. 92-1 ¶ 68), but Defendants did not put the full DOC budget in the record for comparison purposes and failed to demonstrate what proportion of that larger budget it would take to achieve such a task. Defendants were similarly unable to estimate what proportion of their annual budget this total amounted to during oral argument.

Simply put, Defendants have not advanced facts that could demonstrate that their purported financial and administrative interests (staff time spent on organizing religious meals for many faith groups) are compelling, beyond their say-so. And even if such interests were more fully demonstrated by facts, Defendants' assertions regarding financial difficulties are not sufficient in light of the reality that another major faith group was, contemporaneous with the Little Policy's provisions applicable to Muslim inmates, subject to an entirely separate set of rules regarding religious fellowship meals. (ECF No. 98 ¶¶ 106–10, 113–17). So long as that differential policy exists as to Passover, as explained in detail in this Court's preliminary injunction Order, in a world in which the Little Policy were reinstated, Defendants cannot demonstrate that the Little Policy was the least restrictive means to manage the financial difficulties allegedly associated with providing Eid feast meals. That is, a lesser restrictive means exists and is used to meet the religious dietary needs of a discrete faith group for Passover, but individuals similarly situated to Mr. Williams did not and would not receive the benefit of that same accommodation.

Defendants' other counterarguments are unavailing. Defendants repeatedly conflate RLUIPA's standard with the First Amendment's standard. (*See* ECF No. 93 at 24–25 (citing First Amendment cases for the principle that courts should afford prison regulations deference)). RLUIPA, in Defendants' own words, "is more stringent," (*id.* at 24) and provides Williams "greater protection." *Holt*, 574 U.S. at 361. Perhaps sensing this, Defendants next contend that the "the arguments raised by Plaintiffs [sic] concerning Passover were not directly analogous [to Williams's situation]." (ECF No. 93 at 33). Defendants say that the accommodations made for Passover are more akin to the accommodations made for Ramadan, but if the Court were to adopt that rationale, the Court would essentially be ruling that certain holidays, like Passover and Ramadan, are more mainstream and/or important than other religious holidays and ceremonies that

faith groups celebrate. Such is contrary to RLUIPA's plain text, which mandates a broad construction. 42 U.S.C. § 2000cc-3(g). Even setting aside that broad rule of construction, religious exercise includes "any exercise of religion whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A). The centrality of a given holiday according to "normal" or "orthodox" practice within a faith group does not control the Court's analysis under RLUIPA; so long as Defendants are able to account for some religious beliefs and holidays, the method by which they do so is relevant in determining whether the failure to accommodate other religious beliefs and holidays is the least restrictive means to achieve a given a compelling interest. Therefore, Defendants' attempt to distinguish their Policies for Passover contemporaneous with the Little Memo is unpersuasive—the Fellowship Meal Policy established by the Little Memo is not the least restrictive means by which Defendants can achieve their stated financial and administrative interests, and Defendants have not generated a genuine issue of material fact on this point. Summary judgment is therefore granted to Williams as to his RLUIPA claim as asserted against the Little Policy, which means that the Little Policy will be permanently enjoined as to SCI-Albion.[6]

### 2. Williams's Claims as to The Availability of Fresh Halal Meat Under the Shelf Stable Policy

Key to the Court's inquiry under RLUIPA's "substantial burden" prong, as applied to Williams's challenges aimed at the Shelf Stable Policy, is whether Williams has a sincerely held religious belief. *See Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014). While a court is not to question religious orthodoxy, that is, whether a given belief is "normal" or "commonplace"

---

[6] Though a First Amendment analysis as to the Little Policy could fairly be described as superfluous since Williams prevails under RLUIPA and monetary damages as to any asserted claim are unavailable because of sovereign immunity and qualified immunity, for the sake of completeness, the Court will also evaluate the Little Policy as to the asserted First Amendment claims later in this Opinion, when it addresses Defendants' Motion for Summary Judgment.

within the scope of the claimant's asserted religion, courts must examine whether a given belief is both "religious" and "sincere" to "filter out insincere requests." *Id.* at 566; *see Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) ("Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, *see* 42 U.S.C. § 2000cc-5(7)(A), the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity."); *Gillette v. United States,* 401 U.S. 437, 457 (1971) ("'[T]he "truth" of a belief is not open to question'; rather, the question is whether the objector's beliefs are 'truly held.'") (citation omitted).

A genuine dispute of material fact remains as to whether Williams's asserted belief that halal meat for Eid meals must be *fresh*—that is, consumed within three days of its slaughter—is sincere. Such belief was first and only raised by Williams late in this litigation, after Defendants announced their new Policy pertaining to shelf stable food. Prior to the announcement of this Policy, the belief that halal meat must be fresh was never raised by Williams, fairly generating some skepticism as to Williams's current assertions.

While Williams and several of his fellow Muslim inmates at SCI Albion now assert that they share the same belief, word for word, "[t]o celebrate Eid al-Adha, Muslims must consume fresh, halal meat." (*E.g.*, ECF No. 103-2 ¶ 3; ECF No. 103-3 ¶ 3; ECF No. 103-5 ¶ 3), this same statement does not appear in declarations submitted by Williams prior to the announcement of the Shelf Stable Policy, even though some of the individuals who submitted new declarations had previously submitted declarations prior to the Court's preliminary injunction Order. (*E.g.*, ECF No. 103-10; ECF No. 103-11). Indeed, Williams himself did not discuss *fresh* halal meat in his *pro se* filings or his 2023 declaration. (ECF No. 103-18). When stating what qualified as halal according to *his* interpretation of *his* religion, Williams said "[i]n order to be considered halal, meaning lawful or permitted, meat must be from a permissible animal and that animal must be

slaughtered in an appropriate ritual manner." (*Id.* ¶ 18). At that point in time, he made no mention of the timeline from slaughter to consumption of a halal meal, instead only referencing the inadequacy of a lack of any meat for the Eid holidays.

This record is buttressed by Defendants' assertion that the halal mainline food available to SCI-Albion inmates prior to the implementation of the Little Policy in 2023 was not, under Williams's meaning of the word, *fresh*. Yet the record reflects that Williams ate it nonetheless and did so without protest.

Even with this multi-faceted track record of Williams consuming non-fresh meat for the Eid holidays and never mentioning a "fresh" meat requirement for halal meat in any of the declarations and filings made prior to the advent of the Shelf Stable Policy, the assessment of the evidence regarding the sincerity of Williams's religious belief as to *fresh* halal meat goes to credibility, and a credibility determination such as this should generally be resolved at a trial, even when there is significant record evidence calling that credibility into question. *Nuness v. Simon & Schuster, Inc.*, 325 F. Supp. 3d 535, 544 (D.N.J. 2018) (citing *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("Credibility determinations are the province of the fact finder, and thus at the summary judgment stage credibility issues should be resolved against the moving party.")).

The Court cannot conclude, as a matter of law, that Williams is insincere about his stated belief about the need for *fresh* halal meat as part of an Eid feast meal, but when drawing all reasonable inferences in the favor of the Defendants, as the Court must when evaluating Williams's Motion, the Court similarly cannot conclude that such belief is sincerely held, as a reasonable fact finder could easily find for Defendants on this issue given the evidence currently in the record about Williams's late-arriving reference to fresh halal meat and his seemingly long-standing

consumption of non-fresh halal meat for Eid observances. Because a sincere religious belief is a necessary element of a RLUIPA claim, this fact issue precludes summary judgment for Williams as to this portion of his RLUIPA claim aimed at the Shelf Stable Policy. The Court therefore need not reach the strict scrutiny portion of the analysis for this specific belief at this point in time.

This conclusion applies with equal force with respect to Williams's First Amendment claim as to the availability of *fresh* halal meat at Eid meals, as such claims also require a sincerely held religious belief. *See DeHart*, 227 F.3d at 51 ("[O]nly those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection."). Summary judgment is unavailable for Williams for this claim, as well.

### 3. Charitable Giving Prong of the Shelf Stable Policy

Williams's assertions about his beliefs about charitable giving in the form of inmate financial contributions to cover halal meals for other inmates are not "new." While his and other prior record declarations do not discuss it in great detail, the Amended Complaint does reference it. (ECF No. 74 ¶¶ 16, 19, 27). Assuming that preventing Muslim inmates from donating funds/food to each other is a substantial burden upon a religious exercise, a prison's interest in regulating or prohibiting the transfer of money or items between inmates so as to lessen the possibility for illicit activity to occur is self-evident and compelling for RLUIPA purposes as a matter of law. *See Banks*, 601 F. App'x at 106 ("[T]he defendants provided evidence that they did not let inmates purchase items for each other on the basis of security concerns. The rationale they provided was that an inmate who buys things for another inmate could coerce that inmate to perform illicit or illegal acts, engage in blackmail, or otherwise jeopardize the security of the institution. On the record before us, it does not appear that the security and budgetary interests the defendants describe could be achieved by a different or lesser means.") The DOC's interest in

ensuring penological safety and security is compelling and the ban on the exchange of funds and food between inmates is the least restrictive means to achieve that interest. Consequently, summary judgment cannot be had for Williams as to his RLUIPA claim as alleged against the inter-inmate charitable giving prong of the Shelf Stable Policy.

The same is true for Williams's First Amendment claim as alleged relative to the charitable giving aspect of the Shelf Stable Policy, as the DOC need only demonstrate a legitimate governmental interest for its Policy under that Amendment. For instance, alternatives exist for inmates via having family members donate to the monetary accounts of indigent DOC inmates, and ordering the DOC to allow such charitable inter-inmate giving within a penal institution would necessarily put a heavy strain on prison resources by requiring thorough regulation and monitoring of such transactions. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). Summary judgment is denied for Williams as to his First Amendment claim seeking to enjoin this aspect of the Shelf Stable Policy as well.

### c. Defendant's Motion for Summary Judgment on the Claims for Injunctive Relief

Turning now to Defendants' Motion for Summary Judgment, focusing first on the Little Policy, summary judgment is granted for Defendants as to Williams's challenge to that policy under the First Amendment. As for the Shelf Stable Policy, summary judgment is granted for Defendants as to the charitable giving provisions of that policy, as to both the RLUIPA and First Amendment claims. Summary judgment is also granted for Defendants as to the fresh halal meat aspect of the Shelf Stable Policy, but only as to Williams's First Amendment claim. Summary judgment is denied for Defendants as to Williams's challenge to the Shelf Stable Policy specific to his belief that halal meat must be fresh, but only as to his RLUIPA claim.

### 1. The Little Policy

The same problems that impact Defendants under RLUIPA do not doom their arguments as to the First Amendment claims. Because the test applied under the First Amendment is more generous, requiring only that penological interests be reasonably related to legitimate interests and that the cost of accommodating a given religious belief on other inmates, guards, and prison resources be accounted for by the Court, the impediments to Defendants' position under RLUIPA are not present in a First Amendment analysis.

First, the existence of a lesser restrictive means—the DOC's different policy for religious meals for inmates celebrating Passover—does not create a fact issue that precludes summary judgment as to this portion of Williams's First Amendment challenge. Second, Defendants' financial and administrative concerns regarding the provision of halal food supplements for all Muslim inmates are legitimate and rationally tied to the Little Policy's mechanism, which did away with food supplements in order to lessen the financial and administrative burden on the DOC and its staff. Third, the alternate means available to Williams and those similarly situated to consume halal meat for the Eids[7]—the option to purchase a shelf stable halal meat supplement—also weighs in Defendants' favor. Between the DOC's legitimate financial and administrative concerns, the DOC's rational relation to such concerns, the burden on the DOC and staff resources if the pre-Little Memo policy were reinstated, and the alternate means available to Plaintiff to exercise his religious belief in the form of the Shelf Stable Policy, the Little Policy passes muster under the First Amendment, and summary judgment is granted for Defendants on this issue.

---

[7] The analysis in this subsection sets aside Williams's asserted religious belief about *fresh* halal meat, as such did not arise until later in the litigation and is not relevant to the disposition of the claims related to the Little Policy.

## 2.  The Charitable Giving Prong of the Shelf Stable Policy

Though Williams is unable to obtain summary judgment on his RLUIPA and First Amendment claims aimed at the inter-inmate charitable giving prong of the Shelf Stable Policy, Defendants are.

Applying the *Turner* factors, first, as set forth above, the DOC's interest in curbing illicit monetary transactions in its prisons is legitimate and compelling as a matter of law given the need to deter criminal conduct and ensure inmate safety. *See Banks*, 601 F. App'x at 106. Second, as to the Shelf Stable Policy, inmates such as Williams can ensure that fellow inmates have enough money in their food vendor accounts, if they are so compelled, by asking persons outside the prison to charitably give to other inmates on their behalf. Third, enjoining this aspect of the Policy would certainly create unduly burdensome regulatory costs for DOC officials, in large part because the DOC's Policy in these regards would likely be called into question not only with respect to charitable giving for Muslim inmates at the Eid holidays, but because charitable giving in association with a religious holiday would then be required for all inmates because of the Fourteenth Amendment's heightened scrutiny for different standards and classifications based on religion. *Hassan v. City of New York*, 804 F.3d 277, 301 (3d Cir. 2015), *as amended* (Feb. 2, 2016). Fourth, Williams advances no meaningful alternative that would better accommodate his rights while presenting minimal prejudice to the DOC. A return to the pre-2023 religious meals policy (the relief Williams seeks), while an available alternative, would come at a high financial and administrative cost to the DOC, and given that this factor asks whether available alternatives present only a *de minimis* cost, this alternative is unreasonable. Consequently, this factor weighs in the DOC's favor, as well.

Though RLUIPA places a higher burden on government entities than does the First Amendment in order to justify their conduct, the charitable giving aspect of the Shelf Stable Policy also satisfies strict scrutiny for RLUIPA purposes. The needs to prevent illicit transactions and to ensure prison safety and security are facially compelling, *Cutter*, 544 U.S. at 725 n.13 ("It bears repetition . . . that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area."), and the restriction on such monetary transactions is the least restrictive means to achieve that interest in the context at issue in this litigation. Therefore, summary judgment is granted for Defendants, on both the First Amendment and RLUIPA claims, as to Williams's claims regarding the charitable giving aspect of the Shelf Stable Policy.

### 3. The "Fresh Halal" Prong of the Shelf Stable Policy

As to Williams's claims relative to the portion of the Shelf Stable Policy concerning the provision of non-fresh halal meat, fact issues preclude summary judgment for Defendants as to Williams' RLUIPA claim. As for the First Amendment claim, no reasonable fact finder could find for Williams on this claim due to the lower burden imposed on the DOC under *Turner.*

Although the First Amendment (along with RLUIPA) protects "only those beliefs which are both sincerely held and religious in nature," *DeHart*, 227 F.3d at 51, when drawing the inferences in Williams's favor, fact issues preclude summary judgment on the RLUIPA challenge based on Williams's belief that halal meat must be *fresh*. There is enough on the record, via current the statements of Williams and several other SCI Albion inmates, for a reasonable fact finder to conclude that Williams's belief regarding the necessity for fresh halal meat is both sincere and religious. Most persuasive is the declaration of Sean Fields, who cites authority for this belief from Islamic text. (ECF No. 99-5). While this declaration is not enough for the Court to conclude that *Williams's* belief about *fresh* halal meat is sincere as a matter of law, when drawing the reasonable

inferences in his favor, this declaration creates a fact issue as to the sincerity of Williams's stated religious belief as to fresh halal meat that Defendants cannot overcome at this procedural stage.

For the RLUIPA claim, because a fact issue extends to the authenticity of the claimed religious belief, a fact issue also exists as to whether the DOC's policy allegedly interfering with that belief forces a "substantial modification" of Williams's behavior, as courts that conduct RLUIPA inquires turning on the dietary adherence of a given faith often view the existence of a sincerely held religious belief and a prohibition on the exercise of that belief as inextricably intertwined under the "substantial burden" prong of RLUIPA. *Holt*, 574 U.S. at 361 ("In addition to showing that the relevant exercise of religion is grounded in a sincerely held religious belief, petitioner also bore the burden of proving that the Department's grooming policy substantially burdened that exercise of religion. Petitioner easily satisfied that obligation. The Department's grooming policy requires petitioner to shave his beard and thus to 'engage in conduct that seriously violates [his] religious beliefs.'"); *Schlemm v. Wall*, 784 F.3d 362, 364–65 (7th Cir. 2015) ("The Supreme Court's formulation leaves a lot of uncertainty. How is a court to tell whether a given restriction seriously violates or contradicts religious beliefs? What, indeed, does seriously mean?—more than modestly and less than overwhelmingly, but there's a lot of space in that range. Schlemm says that inability to eat game meat at the Ghost Feast has a serious effect, and the record is not so lopsided as to permit that contention's rejection on summary judgment.")

Because, when drawing all reasonable inferences in his favor, Williams's claimed religious belief about *fresh* halal meat could be read as sincere, and because a fact finder could conclude that the Shelf Stable Policy substantially burdens Williams's exercise of that religious belief, to obtain summary judgment on Williams's RLUIPA claim alleged against this aspect of the Shelf

Stable Policy, the DOC must demonstrate that the Shelf Stable Policy is the least restrictive means to achieve a compelling interest. That it cannot do at summary judgment.

As to whether the DOC's stated interests are "compelling," as discussed in greater detail above, the DOC relies upon general assertions about financial costs and the need to maintain the same policies for every qualifying faith group, but those interests alone do not necessarily carry day under RLUIPA. *Haight*, 763 F.3d at 564 ("[B]road generalities about the government's interest unmoored from the particularities of this case will not suffice."). There is no record demonstration that the financial and administrative interests at play are so burdensome in the context of overall DOC operations that they alone are compelling,[8] especially since this new Policy both requires that inmates pay for their supplement and bars inmates from paying for each other's food.

Nor is the Shelf Stable Policy's mechanism of providing non-fresh meat to Williams necessarily the least restrictive means as a matter of law because, as discussed above, the DOC is capable of accommodating a religion's major rites and feasts as seen in how it handles Passover meals. (ECF No. 98 ¶¶ 107–119). Though the DOC contends that Passover is no longer subject to special rules under the Shelf Stable Policy, the record establishes that such is not the case. (*Id.*). While Defendants rely on an asserted distinction between religious "traditions" and religious "rites," a reasonable fact finder could view the DOC's distinct Passover rules, under every version of the DOC's religious meals policy, as evidence that there is a lesser restrictive means available to accommodate inmates' religious dietary beliefs while also acknowledging the DOC's financial interests. Thus, fact issues as to the compelling interest and least restrictive means prongs of RLUIPA preclude summary judgment for Defendants.

---

[8] Despite the reality that these assertions fail to qualify as compelling as a matter of law, as discussed in greater detail above, they are, at minimum, legitimate.

However, as to the First Amendment claim, Defendants have satisfied *Turner's* four-factor test as a matter of law. Assuming for these purpose that Williams's belief regarding fresh halal meat is sincerely held, the burden shifts to the DOC to demonstrate that its stated interests are legitimate and reasonably related to the means implicated by the Shelf Stable Policy. While those interests cannot satisfy RLUIPA because of the broad and general nature by which they were asserted and because of the substantially higher bar placed on governmental justifications for challenged conduct, those interests do satisfy the First Amendment. This is because, under *Turner*, the interests at play need only be legitimate and the connection between the challenged conduct and those interests need only be rational. *Firewalker-Fields v. Lee*, 58 F.4th 104, 114 (4th Cir. 2023) ("[W]hile RLUIPA requires a form of strict scrutiny in the prison context, 42 U.S.C. § 2000cc-1(a), the First Amendment provides less robust protection.").

Here, the record before the Court demonstrates that the DOC's interests related to the financial and administrative burdens that Williams's requested relief would impose are facially legitimate ones—implementing the pre-Little Memo policy would present not insignificant financial and administrative hurdles—and the Shelf Stable Policy's mechanism is rationally related to those interests because it saves costs and administrative time by having all faith groups place bulk orders for single-content religious meals.

In addition to requiring courts to examine whether a given government interest is rational and the means used to achieve it is rationally related to that interest, *Turner* also requires courts to examine whether the plaintiff retains an alternative means of exercising the right at issue, the costs that accommodating the right would impose on other inmates, guards, and prison resources generally, whether there are alternatives to the regulation that fully accommodate the prisoner's rights at de minimis cost to valid penological interests. *Waterman*, 183 F.3d at 213.

The second factor weighs in Williams's favor, as the Shelf Stable Policy is the lone means by which he can purchase halal meat for the Eids. His only other option is to eat the mainline Kosher meal at SCI-Albion (which the record reflects is also halal compliant), which does not accommodate Williams's belief regarding the consumption of *fresh* meat for the Eids.

The third and fourth factors, however, weigh in Defendants' favor. The administrative cost on prison officials of accommodating a relatively specialized religious belief about the very short time frame (3 days) within which food must be slaughtered, transported, prepared, and consumed is not insignificant.

As for the fourth factor, while Williams could rely on the pre-2023 religious meals Policy and the separate Passover Policies as evidence that alternatives do exist that his belief about *fresh* halal meat could be accommodated, the Court cannot conclude that either of those alternatives have *de minimis* cost to the DOC's stated financial and administrative interests—while either Policy could theoretically be implemented, the cost of such must also be considered, and per the DOC, the cost of re-establishing the pre-2023 *status quo* is burdensome. (ECF No. 131 ¶¶ 15, 16, 20, 22, 24). While that argument fails to succeed under RLUIPA where, if a lesser restrictive means exists, "the Government must use it," *Holt*, 574 U.S. at 365, under the First Amendment, the costs to the Government satisfy the First Amendment's legitimacy factor. As a result, the availability of alternatives does not weigh in Williams's favor given the cost associated with those alternatives.

Further, it is not lost on the Court that the Shelf Stable Policy is itself an alternative policy established by the DOC after the Little Policy was preliminarily enjoined. When the Little Policy was in place, Williams sought a lesser restrictive means to accommodate his stated religious belief regarding the consumption of halal meat for the Eids. He received it in the form of the Shelf Stable Policy but now argues, for the first time, that such is still not enough because halal meat eaten

around the Eids must be *fresh*. Under RLUIPA, which is far more protective of his rights, it may turn out that he is correct, *see Firewalker-Fields*, 58 F.4th at 119 (rejecting prisoner's First Amendment claims and stating that the unavailability of a RLUIPA claim due to mootness "makes all the difference here"), but under the First Amendment, which requires a significant and higher degree of deference to prison regulations, *Turner*, 482 U.S. at 89–90, it cannot be ignored that the DOC made efforts to accommodate Williams's then-current religious beliefs, only for him to then raise the bar even higher. Thus, beyond the four express *Turner* factors, the DOC's meaningful efforts to accommodate Williams also weigh in Defendants' favor.

In summary, the balance of the *Turner* factors weighs in Defendants' favor, and no reasonable fact finder could find for Williams as to this claim.

## V.    CONCLUSION

For the reasons set forth above, the Court concludes as follows:

- Summary judgment is granted for Williams on his RLUIPA claim but only as applied to his challenge to the Little Policy. The application of the Little Policy shall be permanently enjoined as to SCI-Albion.

- Summary judgment is denied for Williams in all other respects.

- Summary judgment is granted for Defendants as to:

    o   Williams's claims for money damages. Monetary relief is unavailable for Williams.

    o   Williams's claims for equitable relief under RLUIPA and the First Amendment as applied to the charitable giving provision of the Shelf Stable Policy.

- o Williams's claim for equitable relief under the First Amendment insofar as he alleges that halal meat served for the Eid holidays must be *fresh* and that the Shelf Stable Policy fails to comply with that belief.

- o Williams's claim for equitable relief under the First Amendment insofar as he alleges that the Eid holidays require the service of or option to purchase halal meat for the Eid holidays and that the Little Policy violates that belief.

- Summary judgment is denied for Defendants as to:

  - o Williams's RLUIPA claim as applied to the Little Policy.

  - o Williams's claim for equitable relief under RLUIPA insofar as he alleges that halal meat served for the Eid holidays must be fresh and that the Shelf Stable Policy fails to comply with that belief.

Thus, the only issues that remain in this case, to be resolved at a bench trial, are whether Williams has a sincerely held religious belief that halal meat consumed at the Eid feasts must be fresh and if so, whether the Shelf Stable Policy burdens such a belief and is the least restrictive means in addressing a compelling DOC interest.

An appropriate Order will follow.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated: July 26, 2024